UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ AUG 17 2012 ★

BROOKLYN OFFICE

-----------------------------------------------------------------x

ANN BURTON,

                  Plaintiff,

      -against-

**MEMORANDUM AND ORDER**

AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES (AFGE) 1988; ENA JUDD, AFGE
1988 Union President; JOHN GAGE, AFGE 1988
National President; DERRICK F. THOMAS, AFGE
1988 Regional Vice President,

11-CV-1416 (SLT) (LB)

                  Defendants.

-----------------------------------------------------------------x

**TOWNES, United States District Judge:**

       Plaintiff Ann Burton, proceeding *pro se*, brings this action against her former union, the

American Federation of Government Employees ("AFGE"), Local 1988, and three union

officers: Ena Judd, the President of Local 1988; John Gage, the National President of the AFGE;

and Derrick F. Thomas, National Vice President of AFGE District 2. Defendants now move to

dismiss this action pursuant to Rules 12(b)(1), (2) and (6) of the Federal Rules of Civil

Procedure. For the reasons set forth below, defendants' motion is granted in part and denied in

part.

### BACKGROUND

       The following facts are drawn from plaintiff's complaint and the exhibits thereto, the

allegations of which are assumed to be true for purposes of this Memorandum and Order.

Plaintiff is an African-American woman who, at the time this action was commenced in March

2011, was either 56 or 57 years old (Complaint at 3, 4). Between March 2004 and March 2010,

plaintiff was employed by the United States Department of Veterans Affairs (the "DVA") at the



St. Albans Community Living Center (the "SACLC"), a primary and extended care facility located in St. Albans, New York (*id.* at 4, 5; *see* http://www2.va.gov/directory/guide/facility.asp?id=715). Although plaintiff alleges that she was employed as a Licensed Practical Nurse ("LPN") and a Registered Nurse ("RN") (Complaint at 3), plaintiff also alleges that she did not become an RN until July 15, 2008, and was not hired as an RN until May 8, 2010 – after she left the DVA (*id.* at 5).

Until at least April 2009, plaintiff was a member of Local 1988 (*id.* at 4 and Ex. 2). Although plaintiff was honored as Employee of the Month in June 2007 (*id.* at 5 and Ex. 3), she was apparently less popular with her fellow union members. Plaintiff alleges that, beginning in 2004, unspecified defendants "convened Unit A5 staff meetings against plaintiff and created a hostile work environment, which jeopardized patient safety, and affected plaintiff's work performance" (*id.* at 5). At some point prior to January 2008, plaintiff requested, and was granted, a transfer to Unit D3, where she worked under Nurse Manager Ruth Wilson (*id.*).

In a memorandum to Wilson dated January 20, 2008, plaintiff recommended a change in how nursing assistants were assigned (*id.* at Ex. 6). After the change was implemented, a few of the assistants complained (*see id.* at Ex. 1, p. 1) – including one who sent an angry, anonymous letter to Wilson stating, among other things, that no one wanted to work with plaintiff (*id.* at Ex. 7). In addition, defendant Judd, acting in her capacity as President of Local 1988, sent a letter to Cynthia Caroselli, Associate Director of Patient Services, asserting that the change constituted "a change in working conditions" and demanding that the practice "[c]ease and desist" (*id.* at Ex. 5). Judd also informed the nursing assistants that they did "not have to comply with [plaintiff's] assignments" (*id.* at Ex. 1, p. 1).

2

Following this episode, Judd repeatedly failed to intervene in conflicts between plaintiff and management. The first conflict arose after plaintiff became an RN in July 2008, when the DVA twice rejected her applications for a position as an RN (*id.*). Plaintiff had received a scholarship to attend nursing school from the DVA's Employee Incentive Scholarship Program ("EISP"), and had signed a contract which obligated her to provide nursing services to the DVA upon her graduation (*id.* at 5 and Ex. 4). That contract also obligated the DVA to appoint plaintiff to a position in which she could provide those services "as soon as possible" after she completed the EISP-sponsored education and met all applicable requirements for appointment to the position (*id.* at Ex. 4). Plaintiff believed that the DVA's refusal to hire her was a violation of the EISP contract and a "discriminatory employment practice[]" (*id.* at Ex. 1, p. 1), but Judd "said and did nothing" to advocate for plaintiff (*id.*).

A series of conflicts arose in November and December 2008, when plaintiff was repeatedly disciplined by Ginette Joubert, another Nurse Manager (*id.* at Ex. 1, pp. 1-2). According to plaintiff, all of the discipline was unjustified and some disciplinary actions were taken without providing prior notice to plaintiff (*id.*). Nonetheless, Judd said and did nothing in plaintiff's defense (*id.*).

On December 22, 2008, Joubert placed plaintiff on administrative leave (*id.* at Ex. 1, p.2). According to plaintiff, this action was based on "unsubstantiated written allegations, and verbal allegations," but Joubert refused to provide copies of the statements made by plaintiff's accusers (*id.*). Judd declined to intervene on plaintiff's behalf, instead telling her that "there was no need to obtain copies [of the statements because] . . . there were no charges against [plaintiff] . . ." (*id.*). The next day, plaintiff filed an EEO complaint (*id.*).

3

On January 6, 2009, plaintiff was reassigned to clerical duties at the SACLC and was placed in an office close to Joubert and two other supervisors (*id.*). Plaintiff apparently was not told why she was being re-assigned, but was informed by Judd that she was "charged with negligence pending an investigation" (*id.*). After plaintiff complained to Judd that being forced to work in close proximity to "adversaries" – presumably, people she had named in her EEO complaint – was subjecting her "to a hostile work environment," plaintiff was transferred to an adjoining office which was "scented with perfume" (*id.*). When plaintiff complained that she could not work in a "perfumed environment" because of her allergies, Judd threatened to transfer her to another campus and told Joubert to place plaintiff on administrative leave for the rest of the day (*id.*).

Plaintiff was still at SACLC as of January 28, 2009, when an investigator arrived at St. Albans to speak with plaintiff about the negligence charge (*id.* at Ex. 1, p. 3). Judd had not informed plaintiff that the investigator would arrive on that day. Since no union representatives were available, plaintiff was advised by "an unknown messenger" for one of the absent union representatives that she "must not meet with the investigator" (*id.*). According to plaintiff's complaint, the delay in this investigation prejudiced plaintiff because it had the potential to "delay [her] transition from LPN to RN" (*id.*). However, the complaint also alleges that the investigator submitted his findings to the Nursing Site Manager, William Kosel, on January 30, 2009, concluding that the charges were unfounded (*id.*).

On January 30, 2009, plaintiff sent a Report of Contact ("ROC") to Kosel, complaining that Joubert had arrived at the office "smelling like a perfumed skunk" (*id.*). A few days later, Joubert "retaliated" by reassigning plaintiff to the "NY VA Mental Health Care Line Division"

4

effective February 5, 2009 (*id.*). Plaintiff responded by sending Joubert an e-mail, which was copied to Judd, in which plaintiff alleged that the reassignment would "cause a hardship" (*id.*). When plaintiff continued to report to SACLC on February 5 and 6, 2009, Judd approached plaintiff and asked plaintiff to explain the "hardship" (*id.*). Plaintiff explained that the reassignment would force her either to "endanger [her] life" by "waiting at a bus stop at 5am in a high crime neighborhood" or to relocate to Manhattan (*id.*).

Joubert then issued a "Detail," directing plaintiff to work at the NY VA from 8:15 a.m. to 3:15 p.m. each day "pending investigation" (*id.*). Plaintiff alleges that, because of the "[t]ravel time" involved, this "Detail" mandated that she work overtime, in violation of the collective bargaining agreement (*id.*). In addition, plaintiff alleges that "[t]he Detail was retaliatory and occurred after the investigation was concluded to be unfounded" (*id.*). Again, Judd took no action on plaintiff's behalf (*id.*).

On February 24, 2009, plaintiff sent a letter to defendant Thomas, with a copy to defendant Gage, complaining of Judd's actions "or lack thereof" (*id.* at Ex. 1, p. 1). At the start of her letter, plaintiff stated that she was writing to inform Thomas of how Judd's actions "constitute[d] a breach of contract" and to describe how Judd "collaborated with . . . Joubert, to have [plaintiff] removed from St. Albans Community Living Center . . . " (*id.*). The letter then described the various conflicts that plaintiff had had with management between mid-2008 and February 2009 (described above), and accused Judd of saying and doing nothing to defend plaintiff (*id.* at Ex. 1, pp. 1-3). Plaintiff ended the letter by stating, "I have no other recourse than to take further action regarding a Breach of Contract and non-representation" (*id.* at Ex. 1, p. 3).

5

Plaintiff did not receive a written response from Thomas or Gage (*id.* at 5). On April 6, 2009, plaintiff revoked her authorization for union dues to be deducted from her salary (*id.* at Ex. 2). Plaintiff continued to work for DVA for another year, until she was terminated on March 19, 2010 (*id.* at 7). During the fourteen months after she was reassigned from SACLC, plaintiff was was reassigned another six times (*id.* at 6).

### The Instant Action

On March 21, 2011, plaintiff commenced this action – the second of 13 cases which plaintiff filed with this Court between December 23, 2010, and November 11, 2011. The first action – *Burton v. Shinseki*, No. 10-CV-5318 (SLT)(LB) – alleged, *inter alia*, that employees of the DVA discriminated against plaintiff on the basis of her race, color and national origin in violation of Title VII of the Civil Rights Act of 1964. In a Memorandum and Order dated January 24, 2011, this Court explained that Title VII actions brought by an employee of a federal agency should be brought against the head of the agency, and could not be brought against individual defendants (*Burton v. Shinseki*, No. 10-CV-5318 (SLT)(LB), slip op. at 7 (E.D.N.Y. Jan. 24, 2011)). In addition, the Court explained that a plaintiff had to exhaust his or her administrative remedies before filing a Title VII action (*id.* at 6-7).

About two months after receiving that Memorandum and Order, plaintiff commenced this action against Local 1988, Judd, Gage, and Thomas, alleging that these defendants (1) violated Title VII by discriminating against plaintiff "on the basis of plaintiff's race, color, National Origin and whistle-blowing" (Complaint at 3); (2) "breached the AFGE 1988 Contract" by, among other things, "non-representation" (*id.*); and (3) violated plaintiff's Constitutional rights, including her First Amendment rights (*id.* at 3-4). With respect to the Title VII claim, plaintiff's

6

complaint alleges that defendants themselves created a "hostile work environment" by "conven[ing] Unit A5 staff meetings against plaintiff" (*id.* at 5), by "attacking plaintiff's professional nursing delegation of patient care assignments" in the January 23, 2008, letter from Judd to Caroselli (*id.* at 6), and by "knowingly and willfully initiat[ing] adverse actions against plaintiff" (*id.*). In support of this allegation, the complaint quotes from an EEOC document in which Kosel stated that Judd herself had recommended that plaintiff be "moved from campus to campus," causing plaintiff to be reassigned seven times between January 2009 and her termination in March 2010 (*id.* at 6).

Plaintiff's complaint is less specific with respect to plaintiff's remaining claims. Although the complaint alleges breach of the "AFGE 1988 Contract" (*id.* at 4) and states that defendants "violated numerous AFGE 1988 Articles" (*id.* at 8), the complaint does not identify, or quote from, a particular contract. However, the complaint implies that the contract is a collective bargaining agreement between Local 1988 and the DVA, alleging that the contract required defendants to "represent the interest of the plaintiff," but that defendants "failed and refused to represent any of plaintiff's interests, or to file any grievances for plaintiff," forcing plaintiff to "initiate EEO and EEOC proceedings" on her own (*id.* at 4, 7). The complaint alleges that plaintiff suffered damages because defendants "condoned severe and pervasive punitive disciplinary actions," "supported false accusations," and "condoned 'mutiny' by plaintiff's staff and supervisor, which resulted in one 11p - 7a Unit D3 staffing consisting of plaintiff and one Nurses Aide for approximately 17 patients" (*id.* at 3, 6).

Similarly, plaintiff's complaint does not explain exactly how defendants violated plaintiff's Constitutional rights. However, the complaint specifically alleges that the

7

Constitutional rights which were violated "includ[ed] the 1ˢᵗ Amendment" and that defendants "retaliated against plaintiff's complaint of Breach of Contract and non-representation with continued breach and non-representation" (*id.* at 5). The complaint also alleges that defendants "aided management to not only violate the articles [of the collective bargaining agreement] but also Constitutional laws" (*id.* at 8), and that defendants retaliated against plaintiff "for her notice regarding breach of contract [and] non-representation . . . [by] cooperating with management against plaintiff" (*id.* at 4).

In a section entitled, "Injuries," plaintiff lists the consequences of defendants' alleged acts. For example, the first paragraph in that section alleges that "Defendant's Breach of Contract and non-representation, subjected plaintiff to a relentless campaign of severe and pervasive daily incidents of harassment, disparate treatment, and reprisal, which affected plaintiff's professional benefits, terms and conditions of employment, and well-being" (*id.* at 7). The second paragraph states: "Defendant's aided plaintiff's lost job opportunities, damaged reputation, and damage to value of college degree" (*id.*). In a final section entitled, "Relief," plaintiff requests an "Order of Protection," "sanctions . . . for violation of plaintiff's Constitutional rights," and $60 million in compensatory damages (*id.* at 8).

### *Defendants' Motion to Dismiss*

Defendants now move to dismiss this action on various grounds. First, with respect to plaintiff's Title VII claims, defendants argue (1) that plaintiff's discrimination and hostile work environment claims are untimely, (2) that plaintiff has failed to exhaust her administrative remedies, and (3) that they are not proper defendants under Title VII. Second, with respect to plaintiff's claims that defendants failed to represent her interests and condoned or initiated

8

adverse employment actions against her, defendants argue that the Civil Service Reform Act vests exclusive jurisdiction over these claims with the Federal Labor Relations Authority. Third, defendants argue that plaintiff's Constitutional claims must be dismissed because defendants are not governmental actors. Finally, defendants seek to dismiss various State-law tort claims which, they contend, are alleged in the complaint. To date, plaintiff has not responded to these arguments.

## DISCUSSION

### Standard of Review

In considering a motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, a court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 569. If a party does not "nudge [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.*

Because "a Rule 12(b)(6) motion challenges the facts alleged on the face of the complaint . . . or, more accurately, the sufficiency of the statements in the complaint," *see Cortec Indus., Inc. v. Sum Holding L.P*, 949 F.2d 42, 47 (2d Cir. 1991) (internal citations omitted), materials outside the four corners of the complaint are "generally not considered on a motion to dismiss unless the court treats it as one for summary judgment, giving all the parties a reasonable

9

opportunity to present relevant evidence under Rule 56." *Nicholls v. Brookdale Univ. Hosp. Med. Ctr.*, No. 03-CV-6233 (JBW), 2004 WL 1533831, at *2 (E.D.N.Y. July 9, 2004). However, a court can consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citing *Cortec Indus., Inc.*, 949 F.2d at 47-48).

"[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). A court must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 878, 790 (2d Cir. 1994)). If a liberal reading of the complaint "gives any indication that a valid claim might be stated," the court must grant leave to amend the complaint. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999).

### The Title VII Arguments

Plaintiff's complaint in this case expressly alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Specifically, the complaint states that "Defendant's [*sic*] of the Department of Veterans Affairs (DVA) willfully and intentionally violated Plaintiff's rights guaranteed under Title VII of the Civil Rights Act of 1964, in that the Defendant's [*sic*] discriminated against plaintiff on the basis of plaintiff's race, color, National

10

Origin and whistle-blowing, and breached the AFGE contract by non-representation." Complaint at 3. Although it is unclear which defendants plaintiff seeks to name in her Title VII claim, this Court construes this allegation as attempting to raise a claim against Local 1988 pursuant to 42 U.S.C. § 2000e-2(c)(1), which provides that it is "an unlawful employment practice for a labor organization . . . to discriminate against, any individual because of his race, color, religion, sex, or national origin."[1]

"Prior to bringing suit under . . . Title VII . . . , a federal government employee must timely 'exhaust the administrative remedies at his disposal.'" *Belgrave v. Pena*, 254 F.3d 384, 386 (2d Cir. 2001) (per curiam) (quoting *Downey v. Runyon*, 160 F.3d 139, 145 (2d Cir.1998)). The process a federal employee must take to exhaust his or her administrative remedies is somewhat different than the process a private sector employee must follow. Federal employees who believe that they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult an EEO Counselor prior to filing a complaint in order to try to informally resolve the matter. 29 C.F.R. § 1614.105(a). The EEOC regulations require that an "aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). However,

---

[1]Although the above-quoted language could be construed as attempting to name the DVA as a defendant in this action, this Court notes that plaintiff had already filed an employment discrimination claim against Eric Shinseki, the Secretary of Veterans Affairs, prior to commencing this action. In addition, in the course of that prior action and prior to filing the complaint in this case, plaintiff was informed that Title VII actions could not be brought against individual defendants. *Burton v. Shinseki*, No. 10-CV-5318 (SLT)(LB), slip op. at 7 (E.D.N.Y. Jan. 24, 2011)). Accordingly, this Court does not construe the instant complaint as attempting to state a Title VII claim against the DVA or against the individual defendants: Judd, Gage and Thomas.

the Second Circuit has "treated the requirement that a federal employee bring a complaint to his or her EEO for resolution . . . as analogous to the requirement that a private sector employee first bring a complaint to the attention of the [EEOC] for resolution." *Terry v. Ashcroft*, 336 F.3d 128, 150 (2d Cir. 2003). Accordingly, "[t]he requirement that a claim be first raised with the EEO office . . . is not a jurisdictional one, and is subject to waiver, estoppel, and equitable tolling." *Id.*

Defendants move to dismiss plaintiff's Title VII claims on three grounds: (1) that plaintiff's discrimination and hostile work environment claims are untimely, (2) that plaintiff has failed to exhaust her administrative remedies, and (3) that they are not proper defendants under Title VII. The first two of these three grounds find no support in the allegations in plaintiff's complaint. To the contrary, plaintiff's complaint specifically alleges that plaintiff initiated multiple "EEO and EEOC proceedings, which consist of four complaints" (*id.* at 7), although it does not allege who the proceedings were against, what acts of discrimination were alleged, or when or how the proceedings ended.

Defendants do not provide facts to substantiate their timeliness and exhaustion arguments. Rather, defendants fault plaintiff for failing to allege administrative exhaustion in her pleading, stating that plaintiff "has not alleged that she filed any charge of discrimination administratively against Defendants during her employment or after her termination," "does not allege that she filed any charge of discrimination with any state agency or the U.S. Equal Opportunity Commission against the Defendants," and "neither pleads nor attaches to her complaint any Notice of Right to Sue any of the Defendants." Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss ("Defendants' Memo") at 8-9.

12

However, because a Title VII plaintiff's failure to exhaust his or her administrative remedies is an affirmative defense, *see Belgrave*, 254 F.3d at 386, a plaintiff is not required to plead or demonstrate administrative exhaustion at the pleading stage. *See DiPetto v. U.S. Postal Serv.*, 383 Fed. Appx. 102, 104 (2d Cir. 2010) (summary order) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007), which held that since "failure to exhaust is an affirmative defense" under the Prison Litigation Reform Act, "inmates are not required to specially plead or demonstrate exhaustion in their complaints"). Accordingly, defendants' motions to dismiss plaintiff's Title VII discrimination and hostile work environment claims as untimely and for failure to exhaust administrative remedies are denied, without prejudice to raising these issues upon a motion for summary judgment.

Defendants' third argument – that this Court lacks subject-matter jurisdiction because defendants are not "proper defendants" under Title VII – is based on various out-of-Circuit decisions which endorse a very narrow reading of the term, "labor organization," as that term is used in 42 U.S.C. §2000e-2(c). For purposes of Title VII:

> The term 'labor organization' means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

42 U.S.C. §2000e(d). Other subsections of 42 U.S.C. §2000e contain provisions which either define or relate to terms included in the definition of "labor organization." Notably, §2000e(b)

defines the term, "employer," to mean "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person," and to exclude "the United States [and] a corporation wholly owned by the Government of the United States." 42 U.S.C. §2000e(b).

In support of the argument that Local 1988 does not meet the definition of a "labor organization," defendants principally rely on three cases: *Renfro v. Office & Prof'l Employers Int'l Union, Local 277, AFL-CIO*, 545 F2d 509 (5th Cir. 1977); *Luttrell v. Runyon*, 3 F. Supp. 2d 1181 (D.Kan. 1998); and *Bergeron v. Henderson*, 185 F.R.D. 10 (D.Me. 1999).[2] In *Renfro*, the only employee of the Dallas AFL-CIO Council brought suit against her union local, Local 277, for allegedly committing an unlawful employment practice in violation of 42 U.S.C. § 2000e-2(c)(2). The district court held that Local 277 was a "labor organization" as defined by 42 U.S.C. §2000e(d), and that the court had subject-matter jurisdiction over the plaintiff's action. The Fifth Circuit reversed, however, holding that it was "clear" that Local 277 did not meet the definition of a "labor organization" and that the court lacked subject-matter jurisdiction under Title VII.

In reaching this conclusion, the Fifth Circuit began with an abbreviated version of Title VII's definition of "labor organization," stating, "[a] 'labor organization' is any organization '. . .

---

[2]Defendants also cite to *Newbold v. U.S. Postal Serv.*, 614 F.2d 46 (5th Cir. 1980), which held that a postal employee could not sue his union under 42 U.S.C. §2000e-16(c) – the section that provides the exclusive remedy for federal employees who seek to sue their employer for employment discrimination. However, *Newbold* does not address the question at issue here: whether a federal employee can sue his or her union under 42 U.S.C. §2000e-2(c). *See Thomas v. Biller*, No. CV–88–2439, 1989 WL 47710, at *5 (E.D.N.Y. April 26, 1989).

14

in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, . . . or other terms or conditions of employment . . . .'" *Renfro*, 545 F.2d at 510 (quoting 42 U.S.C. s 2000e(d)) (elipses in original). This definition omitted any mention of the phrase, "labor organization engaged in an industry affecting commerce" and the provisions of 42 U.S.C. §2000e(e), which relate thereto.[3]  In

---

[3]Section 2000e(e) provides:

A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twenty-five or more during the first year after March 24, 1972, or (B) fifteen or more thereafter, and such labor organization –

(1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended [29 U.S.C. § 151 *et seq.*], or the Railway Labor Act, as amended [45 U.S.C. § 151 *et seq.*];

(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

(4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

(5) is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

addition, this definition assumed, *sub silentio*, that the phrase, "and includes" (which appears near the start of the definition of "labor organization"), was intended to signal an exhaustive list.

The Fifth Circuit then focused on the term "employer," as used in the abbreviated version of the definition. Quoting portions of the statutory definition of "employer," the Fifth Circuit noted that Congress "limited an 'employer' to '. . . a person engaged in an industry affecting commerce who has fifteen or more employees . . . ." *Id.* (quoting 42 U.S.C. s 2000e(b)) (elipses in original). Since the Dallas AFL-CIO Council, which only employed one person, did not meet the definition of an "employer," the Fifth Circuit concluded that Local 277 could not be a "labor organization" because it did not "deal with a statutory employer." *Id.*

The district court in *Luttrell* did not cite to *Renfro*, but adopted the same reasoning. In *Luttrell*, the plaintiff sued his employer, the United States Postal Service (the "USPS"); his union, the National Association of Letter Carriers ("NALC"); and his union local, alleging, *inter alia*, Title VII claims against the union under 42 U.S.C. §2000e-2(c). The *Luttrell* Court did not quote the statutory definition of a "labor organization," but inaccurately paraphrased it, stating, "[a] 'labor organization' is generally defined under § 2000e(d) as an organization representing 'employees' against 'employers.'" *Luttrell*, 5 F. Supp. 2d at 1191. Then, noting that §2000e(b) defined the term "employer" to exclude the United States and any corporation owned by the United States, and that "the NALC does not represent employees against any other employer but the USPS," the *Luttrell* Court concluded that the NALC was not a "labor organization" because it did not "represent employees against 'employers' as the term is defined in Title VII." *Id.*

*Bergeron*, like *Luttrell*, was brought by a USPS employee who alleged a Title VII claim against the NALC under 42 U.S.C. §2000e-2(c). In rejecting this claim, the *Bergeron* Court

16

relied on *Luttrell*, citing the case for the sweeping proposition that "the statutory definition of 'labor organization' excluded labor organizations that represent federal employees against federal employers." *Bergeron*, 185 F.R.D. at 15. Without finding that the NALC represented only USPS employees, the *Bergeron* Court adopted the reasoning in *Luttrell*, stating:

> A "labor organization" as used in 42 U.S.C. §2000e-2(c) is defined in terms of its relationship with "employees" who are employed by an "employer." Specifically, 42 U.S.C. §2000e(d) defines a "labor organization" as an organization representing "employees" against "employers." The definition of "employer" expressly *excludes* any "corporation wholly owned by the United States." *See* 42 U.S.C.2000e(b). The United States Postal Service ("USPS") is a corporation that is wholly owned by the United States, *see Luttrell*, 3 F. Supp. 2d at 1191 (USPS is an entity of the United States), thus, the USPS is not an "employer," and the Union cannot, by definition, represent employees of an "employer." *See* 42 U.S.C. §2000e-2(c); 42 U.S.C. §2000e(d); *Luttrell*, 3 F. Supp. 2d at 1191.

*Bergeron*, 185 F.R.D. at 15 (emphasis in original).

In 1999 – six months after *Bergeron* was decided – the Fourth Circuit addressed a question which was nearly identical to the one addressed in *Luttrell* and *Bergeron*: whether a labor union that represented exclusively federal employees could constitute a "labor organization." In the Fourth Circuit case – *Jones v. American Postal Workers Union*, 192 F.3d 417 (4th Cir. 1999) – the plaintiff, a former postal worker, sued his union and his local, alleging a violation of the ADA, rather than Title VII. However, since the ADA provides that the term "labor organization" shall have the same meaning given that term in Title VII, 42 U.S.C. §12111(7), the *Jones* Court was required "to resolve the . . . question of whether a labor union that represents federal employees may constitute a labor organization as that term is defined in Title VII." *Jones*, 192 F.3d at 420.

17

Unlike the Courts in *Renfro*, *Luttrell* and *Bergeron*, the *Jones* Court did not start with an abbreviated or paraphrased version of the statutory definition of "labor organization," but engaged in a detailed analysis of the actual statutory definition. In addition, the Fourth Circuit, unlike the other courts, had the benefit of an *amicus* brief from the EEOC, which argued that "the language of §2000e(d) broadly covers labor organizations of all kinds." *Id.* at 425. According to *Jones*, the EEOC pointed out "that an interpretation subjecting labor organizations that represent federal employees to Title VII and ADA liability fully comports with Congress' primary purpose in enacting these statutes of eradicating targeted employment discrimination," and "that the opposite interpretation would lead to the anomalous result, surely not intended by Congress, of nonfederal employees being allowed to sue their employers and labor organizations for violations of Title VII and the ADA, but federal employees only being allowed to sue their employer." *Id.*

After carefully evaluating the statutory language, the Fourth Circuit concluded that "Title VII's definition of labor organization is ambiguous as to whether a labor organization that represents federal employees may be subject to liability under Title VII." *Id.* at 426. The Court then addressed the question of what deference should be accorded the EEOC's interpretation of the statute. After concluding "that the EEOC's interpretation [was] entitled to full *Chevron* deference" and was "based on a permissible construction of the statute," *id.* at 427 (citing *Chevron U.S.A, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)), the Court concluded that the American Postal Workers Union and the plaintiff's local "constitute[d] labor organizations for purposes of Title VII liability." *Id.* at 428.

The Second Circuit has not decided the question addressed in *Jones* or otherwise commented on any of the four decisions discussed above. None of these decisions is binding

18

upon this Court. Nonetheless, this Court finds the reasoning of *Jones* far more persuasive than

the reasoning of the other cases. As noted in *Cogburn v. American Fed'n of Gov't Employees*,

No. 1:06cv425WJG-JMR, 2006 WL 2884505 (S.D.Miss. Oct. 10, 2006), *Renfro*, *Luttrell* and

*Bergeron* "only address the language following the phrase 'and includes,'" and ignore the

"broader language" which precedes that phrase in §2000e(d)'s definition of "labor organization."

*Id.* at *3. Accordingly, this Court declines to find, as a matter of law, that Local 1988 does not

meet Title VII's definition of a "labor organization." Defendants' motion to dismiss plaintiff's

Title VII claim under 42 U.S.C. §2000e-2(c) is, therefore, denied.

### Breach of Duty of Fair Representation and Related Unfair Labor Practices

Plaintiff's complaint repeatedly accuses defendants of breaching the "AFGE 1988

Contract" by failing and refusing to represent her interests. The complaint not only implies that

defendants did not adequately represent her in disciplinary proceedings, stating that defendants

"condoned severe and pervasive punitive disciplinary actions," Complaint at 3, but alleges that

defendants "knowingly and willfully initiated adverse actions against plaintiff." *Id.* at 6.

Specifically, the complaint alleges that defendants "initiated adverse actions against plaintiff by

attacking plaintiff's professional nursing delegation of patient assignments," and that Judd

herself recommended that plaintiff be "moved from campus to campus," thereby causing plaintiff

to be "reassigned seven times and Detailed once in violation of [the] AFGE Contractual

Agreement." *Id.* The complaint also implies that defendants sided with other employees in

disputes with plaintiff, stating that defendants "supported false accusations" and "condoned

'mutiny' by plaintiff's staff and supervisor." *Id.* at 3, 6.

Defendants now move to dismiss these claims, arguing that this Court lacks subject-matter jurisdiction over them and that plaintiff must proceed under the Civil Service Reform Act of 1978 (the "CSRA"), 5 U.S.C. §7101 *et seq.* Characterizing these claims as alleging "unfair labor practices" ("ULPs") under various subsections of 5 U.S.C. §7116(b), defendants argue plaintiff was required to file a complaint concerning the ULPs with the Federal Labor Relations Authority (the "FLRA") before seeking judicial review. Defendants further note that, even if plaintiff had filed a complaint with the FLRA, judicial review of the FLRA's determination would be before the Second Circuit Court of Appeals, not this Court.

Defendants' argument turns on an important distinction between private and government employees. In a series of cases decided in the 1940's and 1950's, the Supreme Court implied a private cause of action for private sector employees seeking to sue their unions for breach of the duty of fair representation. *See Karahalios v. Nat'l Fed'n of Fed. Employees, Local 1263*, 489 U.S. 527, 534 (1989). The Supreme Court did so in light of the fact that neither the National Labor Relations Act ("NLRA"), 29 U.S.C. §151 *et seq.*, nor the Railway Labor Act ("RLA"), 45 U.S.C. §151 *et seq.*, expressly made a breach of the duty of fair representation an unfair labor practice or expressly provided for the enforcement of such a duty by the National Labor Relations Board ("NLRB"). Recognizing that members of bargaining units were forced to accept unions as their exclusive bargaining agents and had no administrative remedy for a breach of the duty, the Supreme Court not only implied a duty of fair representation under these statutes, but also recognized a judicial cause of action on behalf of the employees. *See Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 205-07 (1944); *Trainmen v. Howard*, 343 U.S. 768 (1952); *Syres v. Oil Workers*, 350 U.S. 892 (1955).

20

Following the enactment of section 8(b) of the NLRA in 1947, the NLRB construed the NLRA as imposing a duty of fair representation on union bargaining agents and making its breach an unfair labor practice. *See Miranda Fuel Co.*, 140 N.L.R.B. 181 (1962), *enf. denied, NLRB v. Miranda Fuel Co.*, 326 F.2d 172 (2d Cir. 1963). A few years later, in *Vaca v. Sipes*, 386 U.S. 171 (1967), the Supreme Court addressed the question of whether, in light of *Miranda Fuel Co.*, federal courts still had jurisdiction to enforce the unions' duty. The Court answered that question in the affirmative. However, as the Supreme Court explained in *Karahalios*, the *Vaca* Court framed the question as "whether Congress, in enacting § 8(b) in 1947, had intended to oust the courts of their role of enforcing the duty of fair representation implied under the NLRA." 489 U.S. at 535. The Court "held that the 'tardy assumption' of jurisdiction by the NLRB was insufficient reason to abandon . . . prior cases . . . such as *Syres*." *Id.* Accordingly, district courts continue to have jurisdiction over actions brought by private sector employees alleging that their unions breached the duty of fair representation.

In 1989, the Supreme Court considered the question of whether to imply a cause of action for *federal* employees seeking to enforce their unions' duty of fair representation. In *Karahalios, supra*, the Supreme Court analyzed Title VII of the CSRA, part of "an integrated scheme of administrative and judicial review" which Congress had enacted in 1978 to replace the "outdated patchwork of statutes and rules built up over almost a century that was the civil service system." *United States v. Fausto*, 484 U.S. 439, 444-45 (1988). The Supreme Court noted that the CSRA incorporates a duty of fair representation, expressly providing:

> A labor organization which has been accorded exclusive
> recognition is the exclusive representative of the employees in the
> unit it represents and is entitled to act for, and negotiate collective

21

> bargaining agreements covering, all employees in the unit. An
> exclusive representative is responsible for representing the interests
> of all employees in the unit it represents without discrimination
> and without regard to labor organization membership.

5 U.S.C. §7114(a)(1). Moreover, the CSRA provides a detailed administrative remedy for

breaches of this duty and for the other unfair labor practices listed in 5 U.S.C. §7116(b).

Specifically, §7118 provides a detailed procedure by which employees' complaints of unfair

labor practices are adjudicated by the FLRA and its General Counsel. If the FLRA determines

"that the . . . labor organization named in the complaint has engaged in or is engaging in an unfair

labor practice," then the FLRA is authorized to order remedial action appropriate to carry out the

purposes of Title VII. *See* 5 U.S.C. §7118(a)(7). Any person aggrieved by the FLRA's final

order "may, during the 60-day period beginning on the date on which the order was issued,

institute an action for judicial review of the . . . order in the United States court of appeals in the

circuit in which the person resides or transacts business or in the United States Court of Appeals

for the District of Columbia." 5 U.S.C. §7123.

The Supreme Court found "no express suggestion in Title VII [of the CSRA] that

Congress intended to furnish a parallel remedy in a federal district court to enforce the duty of

fair representation." *Karahalios*, 489 U.S. at 532. The Court further stated:

> It is . . . an "elemental canon" of statutory construction that where a
> statute expressly provides a remedy, courts must be especially
> reluctant to provide additional remedies. *Transamerica Mortgage
> Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 . . . (1979). In such cases,
> "[i]n the absence of strong indicia of contrary congressional intent,
> we are compelled to conclude that Congress provided precisely the
> remedies it considered appropriate." *Middlesex County Sewerage
> Authority v. Sea Clammers*, 453 U.S. 1, 15 . . . (1981); see also
> *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 147

22

> . . . (1985); *Northwest Airlines, Inc. v. Transport Workers*, 451
> U.S. 77, 93 . . . (1981).

*Id.* at 533. Noting that the duty of fair representation is "expressly recognized in the [CSRA],

and an administrative remedy for its breach is expressly provided for before the FLRA," *id.*, the

Court declined to imply a federal cause of action in favor of federal employees seeking to sue

their union for a breach of the duty of fair representation.

In this case, plaintiff's complaint is alleging principally that her local union and its

president, along with two officers of the national union, breached the duty of fair representation

by failing to represent her adequately in disciplinary proceedings and by siding with other

employees against her. Complaint at 3, 6. Plaintiff's complaint also alleges that defendants

"initiated adverse actions against plaintiff," implying that defendants engaged in an unfair labor

practice by causing the DVA to discriminate against plaintiff for exercising her rights, in

violation of 5 U.S.C. §7116(b)(2). However, because plaintiff is a federal employee, her only

remedy for redressing such unfair labor practices or breach of the duty of fair representation by

the AFGE, the local, or their employees was to proceed under the CSRA. Regardless of whether

plaintiff has done so, she cannot seek her remedy in this Court. *See Karahalios*, 489 U.S. at 529.

This Court lacks subject-matter jurisdiction over plaintiff's claims for breach of duty of fair

representation and related unfair labor practices.

### The Constitutional Claims

Plaintiff's complaint also specifically alleges that "[d]efendants violated plaintiff's

Constitutional rights, not limited to, but including the 1st Amendment . . . ." Complaint at 5.

23

Although uncertain as to precisely what constitutional violations are alleged, defendants argue that they are not government actors and cannot be responsible for constitutional violations.

"The Constitution structures the National Government, confines its actions, and, in regard to certain individual liberties and other specified matters, confines the actions of the States." *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 619 (1991). Thus, "most rights secured by the Constitution are protected only against infringement by governments." *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 156 (1978). "With a few exceptions, such as the provisions of the Thirteenth Amendment, constitutional guarantees of individual liberty and equal protection do not apply to the actions of private entities." *Edmonson*, 500 U.S. at 619 (citing *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988); *Flagg Bros.*, 436 U.S. at 156. Accordingly, "the conduct of private parties lies beyond the Constitution's scope in most instances." *Id.* at 620.

Defendants' Memo addresses one of the exceptions to this general rule, acknowledging that "[a] private entity's action may be considered governmental when it is 'clothed with governmental authority.'" Defendants' Memo at 11 (quoting *Driscoll v. International Union of Operating Engineers, Local No. 139*, 339 F. Supp. 757, 760 (D.Wis. 1972)). This exception has its roots in cases brought under 42 U.S.C. §1983, in which the Supreme Court held that a defendant acts under color of state law where he exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). "Courts of Appeals have held that section 1983 concepts of state action apply in determining whether action was taken 'under color of federal law'" in cases brought pursuant to

*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). *Chin v. Bowen*, 833 F.2d 21, 24 (2d Cir. 1987).[4] Accordingly, private individuals and business entities may be sued under *Bivens* if these "defendants were 'so intertwined with the government as to become painted with color of [federal] action.'" *Strother v. Harte*, 171 F. Supp. 2d 203, 206 (S.D.N.Y. 2001) (quoting *Dorman v. Zavatsky*, No. CV-94-2471DGT, 1995 WL 451018, at *4 (E.D.N.Y. July 21, 1995).

This Court agrees with defendants that this exception is inapplicable here. As defendants correctly note, "the mere fact that a union contracts with the government and/or is regulated by the government is not, in and of itself, sufficient to find the union [is] a government actor." Defendants' Memo at 11 (citing *Blum v. Yaretsky*, 457 U.S. 991 (1982), and *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974)). However, this Court finds nothing in plaintiff's complaint to suggest that plaintiff was attempting to invoke this exception.

In contrast, plaintiff's complaint states that "[d]efendants violated numerous AFGE 1988 Articles and aided management to not only violate the articles but also Constitutional law." Complaint at 8. Read liberally, this language suggests that plaintiff may be seeking to allege that defendants conspired with the DVA to violate plaintiff's constitutional rights. Under some circumstances, a private party who conspires with federal officials to violate an individual's constitutional rights can be held liable under *Bivens*. *See, e.g., Adio-Mowo v. Heinemann*, No. 94 CV 5616 (RR), 1995 WL 313146, at *3 (E.D.N.Y. May 15, 1995) (report and recommendation

---

[4] In *Bivens*, the Supreme Court recognized an implied private action for damages against defendants who are alleged to have violated a citizen's constitutional rights while acting under color of federal law. This implied cause of action is the "federal analog to suits brought against state officials under 42 U.S.C. §1983" for the violation of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Hartman v. Moore*, 547 U.S. 250, 254 n. 2 (2006).

of Gold, M.J.) ("A court-appointed attorney may . . . be held liable under *Bivens* where he or she conspires with federal officials to violate an individual's constitutional rights). However, "[a] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) (per curiam) (citing cases). Moreover, *Bivens* does not provide federal employees with a remedy for a First Amendment violation arising in the context of federal employment. *See Bush v. Lucas*, 462 U.S. 367 (1983); *see also Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (discussing *Bush* and other cases in which the Supreme Court has refused to extend *Bivens* liability).

That portion of plaintiff's complaint which suggests a conspiracy between defendants and management personnel at the DVA is too conclusory, vague, and general to state a claim under *Bivens*. *See Sommer*, 709 F.2d at 175. In addition, the only Constitutional provision specifically mentioned in the complaint is the First Amendment, which could not serve as the basis for a *Bivens* claims. *See Bush, supra.* Since even a liberal reading of the complaint gives no indication that any valid Constitutional claims might be stated, plaintiff's Constitutional claims are dismissed with prejudice. *See Cuoco*, 222 F.3d at 112; *Gomez*, 171 F.3d at 795.

### *Torts Claims*

In a section entitled, "Injuries," plaintiff states: "Defendant's [*sic*] aided plaintiff's lost job opportunities, damaged reputation, and damage to value of college degree." Complaint at 7. Although this sentence is virtually incomprehensible, defendants construe it as alleging "the torts of damage to reputation, job opportunities, and value of college degree." Defendants' Memo at 11. Defendants then argue that New York law "does not recognize the independent tort action of

26

'damage to reputation" or "the tort action of 'damage to value of college degree." *Id.* In addition, defendants argue that, to the extent plaintiff's complaint can be construed as attempting to advance State-law claims for "defamation, libel, slander or malicious prosecution" or "for interference with prospective economic advantage," the pleading fails to state a claim. *Id.* at 12-14.

Although fully cognizant of the duty to "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest,'" *see McPherson*, 174 F.3d at 280, this Court does not perceive this duty as requiring it to construe a *pro se* complaint as alleging torts that do not exist. Accordingly, this Court does not interpret plaintiff's complaint as attempting to allege the non-existent torts of "damage to reputation" or "damage to value of college degree." Rather, this Court interprets these references to damages – which are included under the heading, "Injuries" – as listing consequential damages for which plaintiff hopes to recover.

In addition, plaintiff's use of certain phrases is not interpreted as suggesting causes of action in the absence of facts that would support such claims. For example, this Court does not construe plaintiff's use of the phrase, "damaged reputation," as suggesting State-law claims for "defamation, libel, slander or malicious prosecution" since the complaint does not allege facts suggesting those torts. Similarly, the complaint's use of the phrase, "lost job opportunities," standing alone, does not suggest a tort claim for interference with prospective economic advantage.

## *CONCLUSION*

For the reasons stated above, defendants' motion to dismiss is granted with respect to (1) plaintiff's claims regarding defendants' breach of the duty of fair representation and related unfair labor practices and (2) plaintiff's Constitutional claims. Defendants' motion is denied with respect to plaintiff's Title VII claims under 42 U.S.C. § 2000e-2(c)(1). This Court does not construe the plaintiff's complaint as suggesting any state tort claims. However, to the extent that the pleading can be construed as suggesting State-law claims for "defamation, libel, slander or malicious prosecution" or "for interference with prospective economic advantage," those claims are dismissed for failure to state a claim.

**SO ORDERED.**

/SANDRA L. TOWNES
United States District Judge

Dated: August  *15*, 2012
Brooklyn, New York